IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

2020 JUN 17 PM 4: 03

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | INDICTMENT | |
| v. | Case No. **20 CR 072 JDP** | |
| RAVI MURALI, | 18 U.S.C. § 1347 | |
| Defendant. | 18 U.S.C. § 2 | |

THE GRAND JURY CHARGES:

1. At times material to this indictment:

   a. Defendant RAVI MURALI was a physician who was licensed in the state of Wisconsin and enrolled in the Medicare program.

   **The Medicare Program**

   b. The Medicare Program (Medicare) was a federal health care program that provided benefits to individuals who were at least 65 years old, or disabled. The benefits available under Medicare were governed by federal statutes and regulations. Individuals who received benefits under Medicare were commonly referred to as Medicare "beneficiaries." Medicare was administered by the United States Department of Health and Human Services (HHS) through its agency, the Centers for Medicare & Medicaid Services (CMS).

   c. Medicare was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b) and a "Federal health care program," as defined in Title 42, United States Code, Section 1320a-7b(f).

    d. Medicare was subdivided into multiple parts: Part A covered hospital inpatient care, Part B covered physicians' services and outpatient care, and durable medical equipment (DME), Part C was Medicare Advantage Plans, and Part D covered prescription drugs.

    e. In order for Medicare to pay for DME, it must have been ordered by a physician or other eligible professional who, among other requirements, was enrolled in Medicare or validly opted-out of the Medicare program. 42 C.F.R. § 424.507(a)(iii). A physician was required to apply to be enrolled in Medicare. One way physicians could apply for enrollment in the Medicare program was to use the paper enrollment application process (CMS form 855I).

    f. CMS form 855I required the applying physician to provide various types of information and make certifications, including the following:

      i. The applying physician agreed to abide by the Medicare laws, regulations and program instructions that apply to him. The applying physician certified that he understood that payment of a claim by Medicare was conditioned upon the claim and the underlying transaction complying with various laws, regulations, and program instructions.

      ii. The applying physician certified that he would not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and that he would not submit claims with deliberate ignorance or reckless disregard for their truth or falsity.

### Durable Medical Equipment

g.    Medicare covered an eligible individual's access to DME. Examples of DME included walkers, wheelchairs, oxygen equipment, and accessories, and off-the-shelf (OTS) ankle braces, knee braces, back braces, shoulder braces, wrist braces, and hand braces (collectively, "braces" or "medical braces"). OTS braces required minimal self-adjusting for appropriate use and do not require expertise in trimming, bending, molding, assembling, or customizing to fit the individual.

h.    For any DME item to be covered by Medicare, it must: Be eligible for a defined Medicare benefit category; be reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member; and meet all other applicable Medicare statutory and regulatory requirements.

i.    For certain DME products, Medicare promulgated specific requirements that a DME order must meet for an order to be considered "reasonable and necessary." For example, for OTS knee braces billed to Medicare under the Healthcare Common Procedures Coding System (HCPCS) Codes L1833 and L1851, an order was deemed not "reasonable and necessary" and reimbursement was denied unless the ordering/referring physician documented the beneficiary's knee instability using an objective description of joint laxity determined through an examination of the beneficiary.

### Telemedicine

j.    Telemedicine provided a means of connecting patients to medical professionals by using telecommunications technology, such as the internet or telephone, to interact with a patient.

k.  Telemedicine companies provided telemedicine services to individuals by hiring health care providers. Telemedicine companies typically paid health care providers a fee to conduct consultations with patients. In order to generate revenue, telemedicine companies typically billed insurance.

l.  Medicare Part B covered expenses for specified telemedicine services if certain requirements were met. These requirements included: (a) that the beneficiary was located in a rural or health professional shortage area; (b) that the services were delivered via an interactive audio and video telecommunications system; and (c) the beneficiary was at a practitioner's office or a specified medical facility – not at a beneficiary's home – during the telehealth consultation with a remote practitioner.

### Scheme

2.  From on or about January 1, 2017 to on or about January 7, 2020, in the Western District of Wisconsin and elsewhere, the defendant,

RAVI MURALI,

and others, known and unknown to the grand jury, knowingly and willfully executed and attempted to execute a scheme and artifice to defraud a health care benefit program, namely Medicare, and to obtain, by means of false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of a health care benefit program, namely Medicare, in connection with the delivery of and payment for, health care benefits, items, and services.

3.  It was part of the scheme that MURALI had to be enrolled in Medicare so that he could order medical braces for which Medicare paid. MURALI applied to

enroll in Medicare in November of 2012 by filling out and signing CMS form 855I, which included a section entitled CERTIFICATION STATEMENT, which instructed:

    a.    "The Certification Statement contains certain standards that must be met for initial and continuous enrollment in the Medicare program. Review these requirements carefully. By signing the Certification Statement, you agree to adhere to all of the requirements listed therein . . . ."

MURALI then agreed that he would abide by certain requirements by signing the CERTIFICATION STATEMENT, including:

    b.    "I agree to abide by the Medicare laws, regulations and program instructions that apply to me . . . . I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law) . . . ."

    c.    "I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity."

    4.    It was further part of the scheme that MURALI worked for various telemedicine companies and was paid to conduct telemedicine consults for medical braces. He was paid approximately $30 for each telemedicine consult he completed.

    5.    It was further part of the scheme that as part of these telemedicine consults, MURALI would electronically sign orders and other Medicare-required documents for medical braces that contained false and fraudulent statements, including that he had spoken with the Medicare beneficiary, that he had established a valid

prescriber-patient relationship with the Medicare beneficiary, that he medically assessed the Medicare beneficiary, and that he conducted various examinations and diagnostic tests of the Medicare beneficiary. These representations were rarely, if ever, true, and MURALI ordered braces for Medicare beneficiaries regardless of medical necessity.

6. It was further part of the scheme that these orders and related documents were then used by medical brace suppliers to fraudulently bill Medicare for over $26,000,000, of which Medicare actually paid over $13,000,000.

**Execution**

7. On or about the dates set forth below, in the Western District of Wisconsin and elsewhere, the defendant,

RAVI MURALI,

for the purpose of executing the scheme described above, and in connection with the delivery of and payment for health care benefits, items, and services, knowingly and willfully aided and abetted others, known and unknown to the grand jury, who caused the submission of the following false and fraudulent Medicare claims in the table below, which falsely represented that MURALI had spoken with the Medicare beneficiary, that he had established a valid prescriber-patient relationship with the Medicare beneficiary, that he medically assessed the Medicare beneficiary, and that he conducted various examinations and diagnostic tests of the Medicare beneficiary:

| Count | Approximate Date | Beneficiary | DME Ordered | Amount Billed | Amount Paid |
|---|---|---|---|---|---|
| 1 | 3/4/2019 | B.R. | Right knee brace | $1,238.42 | $698.45 |

| 2 | 3/7/2019 | N.B. | Left wrist brace | $572.13 | $376.58 |
| 3 | 3/28/2019 | N.W. | Left knee brace | $1,050.67 | $698.45 |
| 4 | 4/8/2019 | K.A. | Left knee brace | $965.00 | $698.45 |
| 5 | 4/10/2019 | D.P. | Right knee brace | $895.70 | $698.45 |
| 6 | 4/10/2019 | M.P. | Left knee brace | $895.70 | $669.60 |
| 7 | 4/16/2019 | J.P. | Right knee brace | $1,033.30 | $497.35 |
| 8 | 11/4/2019 | B.W. | Right knee brace | $1,114.19 | $698.45 |
| 9 | 11/15/2019 | C.N. | Right knee brace | $1,114.19 | $698.45 |
| 10 | 11/18/2019 | L.D. | Left knee brace | $1,075.00 | $698.45 |
| 11 | 11/18/2019 | C.S. | Left knee brace | $1,200.00 | $698.45 |
| 12 | 11/25/2019 | C.W. | Right knee brace | $1,114.19 | $698.45 |

(All in violation of Title 18, United States Code, Sections 1347 and 2)

FORFEITURE ALLEGATION

1. The allegations contained in Counts 1-12 are re-alleged and incorporated here for the purpose of alleging and giving notice of forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(C), 982, and 28 U.S.C. § 2461(c).

2. Upon conviction of any of the offenses alleged in Count 1-12, the defendant RAVI MURALI, shall forfeit to the United States of America, pursuant to 18 U.S.C. §, 982(a)(7) and 28 U.S.C. § 2461(c), any property, real or personal, which constitutes or is derived from the proceeds traceable to the offense. The property to be

forfeited includes, but is not limited to, a Money Judgment for a sum of money equal to the amount of proceeds obtained as a result of the healthcare fraud.

3.  If any of the property subject to forfeiture, as a result of any act or omission of the defendant:

    a.  cannot be located upon the exercise of due diligence;

    b.  has been transferred or sold to, or deposited with, a third party;

    c.  has been placed beyond the jurisdiction of the court;

    d.  has been substantially diminished in value; or

    e.  has been commingled with other property which cannot be divided

without difficulty, the United States of America shall be entitled to forfeiture of substitute property pursuant to 21 U.S.C. § 853(p), as incorporated by 18 U.S.C. 982(b)(1) and 28 U.S.C. § 2461(c).

All pursuant to 18 U.S.C. § 982 and 28 U.S.C. § 2461(c).

A TRUE BILL

_____
PRESIDING JUROR

Indictment returned: 06/17/2020

_____
SCOTT C. BLADER
United States Attorney